IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                                Criminal No. 3:24-cr-169

EMANUEL LEON CRAWFORD,

       Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Defendant Emanuel Leon Crawford, Jr.'s ("Crawford" or "Defendant") NOTICE OF OBJECTION TO SENTENCING GUIDELINES CALCULATION, ECF No. 35 ("the OBJECTION"), the several supporting, opposing, and supplemental briefs in response thereto, ECF Nos. 41, 43, 55, 56, 57, the STATEMENT OF FACTS, ECF No. 22, the PRESENTENCE INVESTIGATION REPORT, ECF No. 64 ("the PSR"), the oral argument of the parties during a Sentencing Hearing held on July 15, 2025, and the factual record developed from the papers as well as from testimony and exhibits admitted during an Evidentiary Hearing held on May 22, 2025, ECF Nos. 50, 54.

Crawford was convicted of Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1) upon a plea of guilty to that offense as part of a PLEA AGREEMENT. ECF No. 21, at 1. Before sentencing, Crawford OBJECTED to the PSR because it recommends imposing a four-point (4) sentencing enhancement under the United States Sentencing Guidelines (the "Guidelines") to his

1

Offense Level for possessing a firearm or ammunition "in connection with another felony offense," to wit: Possession with Intent to Distribute a Controlled Substance, pursuant to U.S.S.G. § 2K2.1(b)(6)(B). ECF No. 35, at 1.

Crawford relies on the Supreme Court of the United States' recent decision in Kisor v. Wilkie, 588 U.S. 558, 139 S. Ct. 2400, 204 L. Ed. 2d 841 (2019), and the United States Court of Appeals for the Fourth Circuit's recent decision in United States v. Boler, 115 F.4th 316 (4th Cir. 2024), to argue that: the enhancement's text is genuinely ambiguous; the United States Sentencing Commission's (the "Commission") Commentary to that enhancement, U.S.S.G. § 2K2.1 Comment., n.14(A), reasonably interprets that sentencing enhancement, which warrants judicial deference; and that the facts of this case do not support the application of the four-point enhancement to his Offense Level. ECF Nos. 43.[1]

---

[1] In a supplemental response brief, ECF No. 56, as well as during oral argument at the July 15 Sentencing Hearing, Crawford takes a more equivocal stance compared to his initial position. At times, Crawford contends that the enhancement is genuinely ambiguous. At other times, he contends that the enhancement is not genuinely ambiguous, but then goes on to discuss portions of the Commentary and their impact on the enhancement's application. At other times, Crawford assumes that the enhancement is genuinely ambiguous and argues in the alternative. And, at still other times, Crawford contends that it does not matter at all if the enhancement is genuinely ambiguous or not because it does not apply to Crawford based on the facts of this case.

These equivocal positions make it somewhat difficult to discern whether Crawford's position has substantively changed from his initial position that the enhancement is genuinely ambiguous. As

Whether, upon application of the Kisor/Boler framework, the text of U.S.S.G. § 2K2.1(b)(6)(B) is genuinely ambiguous, or, alternately, whether the Commission's Commentary interpreting that text is reasonable, have not been decided by the Fourth Circuit. Applying that framework, the Court holds that: (1) the text of the enhancement, U.S.S.G. § 2K2.1(b)(6)(B), is not genuinely ambiguous; (2) there is therefore no reason to consider or defer to the Commentary's interpretation of that unambiguous text; and (3) based on the facts of this case, the four-point enhancement applies to Crawford. Therefore, for the reasons set forth below, the OBJECTION, ECF No. 35, was OVERRULED. This MEMORANDUM OPINION explains the reasons for that decision.

## I. BACKGROUND

### A. Factual History[2]

On June 13, 2024, Crawford arrived at a local convenience store named Market Place #14 ("Market #14"), located at 1235 Mosby Street, Richmond, VA, 23223. As reflected in the mutually agreed-to Statement of Facts, this market resides in an area that is a

---

a result, the Court has determined that a genuine legal dispute remains ripe between the parties over whether the enhancement is genuinely ambiguous or not. That dispute necessitates considering all issues relevant to the Kisor/Boler framework.

[2] These facts are a combination of what has been reported in the PSR, ECF No. 64, the Statement of Facts, ECF No. 22, and the testimony of the Government's witnesses at an Evidentiary Hearing held before the Court on May 22, 2025. They are supported by a preponderance of the evidence.

"high drug and violent crime area." ECF No. 22, at 1-2. The parking lot of Market #14 is "often an open-air drug market." Id. at 2. Richmond Police Department ("RPD") officers, in coordination with the federal Drug Enforcement Administration ("DEA") and the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), had been monitoring the area for several months because of increased drug traffic and gun violence. ECF No. 54, at 22. As part of that joint operation, law enforcement officers set up a pole camera to observe activity taking place directly outside Market #14 and its parking lot. Id. That pole camera captured much of what led to Crawford's arrest.[3] The United States presented the pole camera footage of that day at an Evidentiary Hearing held on May 29, 2025, and had an ATF Agent, James Albright, walk the Court through that video.

Agent Albright has an extensive history as a police officer and criminal investigator, particularly in the field of drug and firearm possession and trafficking. Much of that experience was garnered while employed as a law enforcement officer in Washington, D.C. However, he had been employed as an ATF Agent in this joint operation in Richmond, VA, from March through August of 2024. Id.

---

[3] The pole camera was enabled to only capture video footage. It was not enabled to capture audio recordings of the events in question (or any event for that matter).

at 19-22.[4] As part of that investigation, law enforcement officers observed Market #14 for drug- and firearm-related activity and used multiple confidential informants to conduct "controlled purchases" of both firearms and narcotics at and/or near that location. Id. at 22. By the time of his testimony in this case, Agent Albright had observed "hundreds of hours" of criminal (and mundane) activity recorded by that pole camera. Id. at 23.

Crawford was not a direct suspect in this investigation, and did not partake in any controlled purchase; however, the activity which led to his arrest was captured on the pole camera. Id. at 22-24. Upon arrival at Market #14, Crawford did not enter the store. He remained directly outside the store on a small crosswalk that separated the convenience store from its parking lot. Other individuals were already congregated there as well. Based on what is visible in the pole camera's recording, Crawford was dressed in

---

[4] Crawford argues that the Court should give "little weight" to Agent Albright's testimony, at least in part, because "he had very little experience with the drug trade in Richmond, Virginia, with most of his experience coming from his time serving in law enforcement in Washington, D.C." ECF No. 56, at 4 n.1. While it is true that Agent Albright's experience comes primarily from his time as a law enforcement officer in the nation's Capital, Agent Albright demonstrated a strong knowledge of the drug- and firearm-related activities at Market #14 and had been engaged in a months-long investigation into criminal activity in that area. The Court found his testimony credible and informative as to the pertinent facts recorded by the pole camera on June 24, 2024, as well as other aspects of drug possession and drug trafficking activities. Consequently, the Court finds his testimony to be credible and reliable in all respects.

plain clothes, was carrying a cellphone, and was wearing a crossbody bag across the front of his torso. No firearms or drugs were visible at any point during the events captured by the pole camera on June 13, 2024.

Shortly after arriving at the scene, Crawford walked over to a small group of people near the right-hand corner of the building and engaged them in conversation. After a few minutes, an unidentified individual arrived at Market #14 and walked over to where Crawford and the other individuals were located.

The unidentified individual engaged Crawford in conversation, and, at one point, they can be seen "dapping"[5] or "smack[ing] each other's hands." ECF No. 54, at 38. Agent Albright testified that not "every time somebody smacks hands with someone else . . . equal[s] a hand-to-hand drug deal"; however, based on his experience, it is often a form of drug exchange. Id. at 38-39.[6]

---

[5] "Dapping" is an English term that means the "action or practice of greeting or acknowledging someone with a casual gesture, typically involving slapping palms, bumping fists, or snapping fingers." Dapping, Oxford English Dictionary, https://www.oed.com/dictionary/dapping n2?tab=meaning and use#13 74863530 (last visited July 9, 2025).

[6] While such "handshake" exchanges often occur in drug trafficking cases, it is important to note that the events captured by the pole camera were somewhat far in the distance and that the camera's video quality was low, which made it not possible for Agent Albright to identify or discern any object in the hands of Crawford or this unidentified individual (or even if Crawford and this individual did, in fact, have anything at all in their hands during this greeting).

Agent Albright opined, based on the totality of what he viewed on the pole camera footage and what he knew about the area, that this was likely a hand-to-hand drug transaction. Id. at 29-30.[7] He opined that, based on his knowledge of the events, what likely occurred was a greeting between Crawford and the unidentified individual; the unidentified individual gave Crawford money for the drugs; Crawford told the unidentified individual to wait there while Crawford stepped behind the building to extract, from his supply, the purchased quantity of drugs; and then, before Crawford could return and deliver the drugs to the putative buyer, Crawford was apprehended by police officers. The unidentified buyer left the area after it was evident that the police were in pursuit of Crawford. Id. at 31-33, 52.

The record shows that, shortly after that hand-to-hand greeting with the unidentified individual, Crawford walks around the corner of the building, which takes him out of the pole camera's view and out of the presence of the other assembled persons outside Market #14. Although Crawford could no longer be

---

[7] It is also important to note that, before viewing the pole camera footage for the first time, Agent Albright was made aware that Crawford had been charged with possession with intent to distribute narcotics. ECF No. 54, at 40. Crawford notes this point in a supplemental brief and argues that Agent Albright's testimony should be given "little weight" because of, in part, this fact. ECF No. 56, at 4 n.1. The Court considered that argument when assessing the credibility of Agent Albright's testimony, finding that it did not diminish Agent Albright's credibility.

seen in the pole camera's footage, law enforcement officers sitting in a patrol car across the street from Market #14 were observing him as well. Once Crawford walked around the corner of the building, the police vehicle began to approach Market #14.[8]

One of the officers in the vehicle was RPD Officer Mitchell Eric Cooper. As the vehicle approached Market #14, Officer Cooper testified that he again saw Crawford, now with his back toward the vehicle, and observed Crawford's elbows "bent at about 90 degrees, placing his forearms and his hands approximately [at] his lower torso area or, like, upper stomach area, and they seemed to be fiddling . . . or manipulating some unknown object." Id. at 67. The officers parked the vehicle. Then, Crawford turned around, and Officer Cooper could see Crawford with a "tightly clenched fist and what looked like him putting some sort of unknown object back into [his] pocket." Id. at 68.

After seeing Crawford engage in this "suspicious[]" activity, the four officers in the patrol car began to exit the vehicle to talk to Crawford. ECF No. 22, at 2. However, almost immediately, Crawford started to run across the parking lot and away from the police officers. Three of the officers pursued Crawford on foot while Officer Cooper quickly got back into the patrol car to pursue

---

[8] The police vehicle was patrolling the area when these events occurred. The officers were not responding to any radio or 911 call at the scene. ECF No. 54, at 84.

him. After a brief pursuit, the officers cut off Crawford and successfully detained him. ECF No. 54, at 65, 67-68. This exchange was captured by Officer Cooper's body-worn camera, which was also presented to the Court at the May 29 Evidentiary Hearing. That footage had both an audio and visual recording.

Once apprehended, the officers searched Crawford's person and recovered 18 multicolored, multishaped ecstasy pills (some of which were also in fragments) along with a small amount of marijuana from Crawford's front pants pockets. Id. at 72.[9] However, Crawford no longer had the crossbody bag on his person, having discarded it during the pursuit, a fact that was confirmed when Officer Cooper found the crossbody bag on the ground near where Crawford was detained. Officer Cooper patted the outside of the crossbody bag and recognized the shape of its contents as a firearm. Id. at 69-70. However, Officer Cooper did not immediately search the crossbody bag and, instead, ran Crawford's identification information through police databases to determine whether Crawford could, legally, carry a firearm. After searching Crawford's criminal history, determining that he was previously convicted of a felony, and discovering multiple pending warrants for Crawford's arrest, Officer Cooper determined that he had probable cause to search the crossbody bag. Id. at 68-70, 72. So,

---

[9] Laboratory testing later revealed that the pills were methamphetamine pills. ECF No. 54, at 42.

he relayed that information to another officer on the scene who opened the crossbody bag, searched it, and found a loaded firearm inside of it. Id. at 72-73. Crawford was then arrested for the present offense and taken in for questioning.

The firearm inside the crossbody bag was a loaded FNH USA/FN, Model FNX-40, .40 caliber semiautomatic pistol, bearing serial number FX2U000976. ECF No. 22, at 2. After being read the Miranda[10] warnings, Crawford waived his rights and "admitted that he knew the pills in his pocket contained methamphetamine and admitted that he had the firearm for a couple of weeks." Id. He also stated that the pills were for his own personal use, and, throughout the course of police questioning, maintained that he had no intention of selling or otherwise distributing those pills to others. Id.; ECF No. 54, at 79.

In response to Officer Cooper's post-arrest questioning, Crawford stated that he had a high tolerance for the pills, taking approximately two to three pills at a time, daily, to achieve a "high." Id. at 75. Crawford also stated that, typically, a pill costs $10, but that, approximately two weeks before his arrest, he had purchased 40 pills at $5 each for a total of $200. Id.[11] at 75,

---

[10] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[11] Agent Albright testified that, in his experience, this type of pill would usually cost approximately $10 per pill, but that the price-per-pill would decrease if an individual purchased them in

79. So, Crawford had anywhere between $90 to $180 worth of methamphetamine pills on his person at the time of his arrest. Id. at 75. The marijuana weighed a total of 26 grams. ECF No. 64, at 6.[12] Crawford also had approximately $42 in cash on his person. ECF No. 54, at 76. Officer Cooper also asked Crawford why he was carrying the firearm, to which Crawford responded that he did so to "protect himself," particularly after an individual was killed whom Crawford knew personally.[13] Id. at 75-76.

Officer Cooper and Agent Albright also provided testimony, based on their professional experiences, about the typical way that individuals use, purchase, and sell the type of pill that Crawford had in his possession. Officer Cooper testified that oftentimes individuals market the sale of these multicolored, multishaped pills on social media platforms, like X (formerly Twitter) or Instagram. Usually, the pills are ecstasy pills, but there was an emerging trend in which the pills also contain methamphetamine. Id. at 87-89. In his experience, fentanyl or opioid pills come in a standard shape and color because they are

_____

bulk. ECF No. 54, at 45, 47-48. Crawford's description, then, accords with Agent Albright's experiences in this field.

[12] It is unclear from the record what the exact cost was for this marijuana.

[13] The record is unclear on whether this individual was Crawford's brother, a friend, or some other acquaintance. At the July 15 Sentencing Hearing, Crawford's counsel represented that the individual was Crawford's brother.

pharmaceutically mass-produced; however, ecstasy or methamphetamine pills, like the ones in Crawford's possession, are not mass-produced and so it is common that they come in multiple colors and shapes. Id. at 87. Further, in Officer Cooper's experience, individual users of these pills typically purchase only one to two, up to five, pills (or "doses") at a time for around $10. Id. at 88. Then, after consuming that dose, they will return to the dealer to purchase another dose. The amount of a single dose, however, is "dependent on the user's tolerance and their dependence on th[e] specific substance." Id. at 83. Officer Cooper, based on his experience, was unable to say whether an individual who tends to consume two to three methamphetamine pills at a single time is a "heavier" user. Id. at 82-83. But, unlike drug users, drug traffickers, he testified, typically purchase in greater quantities to then sell to others. Id. at 88-89.

Agent Albright similarly testified, based on his experience, that it is exceedingly uncommon, or "very, very, very uncommon," for one "user to purchase more than they can get high with" (one dose) in any given transaction. Id. at 42-43. He testified that this is true without regard to the drug at issue and also stated that what one "dose" looks like for a particular individual varies depending on the person's tolerance level for the drug. Id. at 43. Agent Albright also testified that, in his experience, users do not tend to purchase more than one dose at a time for several

12

reasons, including not having sufficient funds to do so; risk of being robbed before use; or, if they overdose, risk of confiscation from healthcare providers or police. Id. at 44. And, Agent Albright's experience was that individuals who purchase drugs for personal use do not tend to stay in the area long after they purchase those drugs because they want to get to a safe environment to begin ingesting the dose. Id. at 33.

On July 26, 2024, approximately one month after Crawford's arrest on June 13 at Market #14, police executed a misdemeanor search warrant at Crawford's home. There, they found a different loaded firearm: a Taurus Model G2C, 9mm caliber semiautomatic pistol, bearing serial number AEB113559. ECF No. 22, at 2.

Before Crawford's possession of the firearms on June 13 and July 26, 2024, he had been convicted of multiple felonies, including burglary, attempted unlawful wounding, use of a firearm in commission of a felony, and possession with intent to distribute controlled substances. Id. Crawford admits that, at the time of his possession of the firearms discovered in June and July 2024, he knew that he had been previously convicted of these felonies and that he was thus "prohibited from possessing a firearm." Id. at 3.

### B. Procedural History

On November 19, 2024, Crawford was indicted on three counts: (1) Possession of a Firearm by a Convicted Felon ("COUNT ONE"), in

13

violation of 18 U.S.C. § 922(g)(1); (2) Possession with Intent to Distribute Methamphetamine ("COUNT TWO"), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); and (3) Possession of a Firearm by a Convicted Felon ("COUNT THREE"), in violation of 18 U.S.C. § 922(g)(1). ECF No. 1.[14] Crawford appeared before United States Magistrate Judge Mark R. Colombell for a Plea Agreement Hearing at which he was arraigned and entered a guilty plea. ECF No. 18. He pled guilty to COUNT ONE of the AMENDED INDICTMENT for the possession of a firearm by a convicted felon. ECF No. 21, at 1. As part of that Plea Agreement, the United States agreed to dismiss the charges in COUNTS TWO and THREE of the AMENDED INDICTMENT. Id. at 4.[15] Magistrate Judge Colombell provided a Report and Recommendation as to the Plea Agreement, ECF No. 24, which this Court adopted by ORDER. ECF No. 25. A Sentencing Hearing was scheduled before the Court for May 1, 2025.

The United States Probation Office prepared a PSR, which calculated a sentencing range pursuant to the Guidelines. The PSR assessed Crawford a Base Offense Level of 24 for a violation of 18 U.S.C. § 922(g)(1) pursuant to U.S.S.G. § 2K2.1(a)(2). ECF No. 64, at 7. After that initial assessment, the PSR applied a four-point

---

[14] An AMENDED INDICTMENT was filed later, but the COUNTS of indictment did not change. ECF No. 19.

[15] The Court GRANTED the United States' oral motion to dismiss COUNTS TWO and THREE of the AMENDED INDICTMENT, ECF No. 19, at the July 15 Sentencing Hearing. ECF No. 60.

enhancement to Crawford's Offense Level pursuant to U.S.S.G. § 2K2.1(b)(6)(B) because he "used or possessed any firearm or ammunition in connection with another felony offense," namely, possession with intent to distribute controlled substances. Id. The PSR then reduced Crawford's Offense Level by three (3) points because he assisted law enforcement in their investigation and accepted responsibility for his criminal conduct. Id. After these considerations, the PSR calculated Crawford's Total Offense Level at 25. Id. at 8. It also assigned him a Criminal History Category of V based on various prior criminal convictions. Id. at 15. With an assigned Offense Level of 25 and Criminal History Category V, the PSR correctly calculated Crawford's sentencing guidelines range at between 100 to 125 months of incarceration. Id. at 23.

Following the issuance of the PSR, Crawford filed the OBJECTION, ECF No. 35, arguing that the four-point enhancement pursuant to U.S.S.G. § 2K2.1(b)(6)(B) should not apply to him under the standards set out in Kisor, 588 U.S. 558, and Boler, 115 F.4th 316. Without the inclusion of the four-point enhancement, Crawford's Offense Level would reduce from 25 to 21, which, when combined with his Criminal History Category of V, would place him in a new sentencing guidelines range of 70 to 87 months of incarceration. U.S.S.G. Ch. 5, Pt. A. The United States filed a brief in opposition, ECF No. 41, arguing that the enhancement

should apply to Crawford. Crawford promptly submitted his reply. ECF No. 43.

The Court continued the initial Sentencing Hearing and, instead, convened an Evidentiary Hearing to develop the factual record because the enhancement's application, pursuant to its Commentary, changes depending on the related felony offense that the firearm was possessed "in connection with": A "facilitation" standard applies in simple drug possession cases and a "proximity" standard applies in drug trafficking cases. U.S.S.G. § 2K2.1 Comment., n.14(A)-(B). That Evidentiary Hearing was held on May 22, 2025, ECF No. 50, and a transcript was produced, ECF No. 54.

Following the conclusion of the Evidentiary Hearing, the Court ORDERED the United States and the Defendant to submit supplemental briefing on several factual and legal issues relevant to the determination of the appropriate sentencing guidelines range and consequent sentence to impose. ECF No. 52. After consideration of that briefing, ECF Nos. 55, 56, 57, the Sentencing Hearing was reconvened on Tuesday, July 15, 2025.

During the Sentencing Hearing, the Court heard oral argument on the OBJECTION, ECF No. 35, as well as on Crawford's MOTION FOR A DOWNWARD VARIANCE FROM THE SENTENCING GUIDELINES, ECF No. 36, and the 18 U.S.C. § 3553 sentencing factors. After argument, the Court overruled Crawford's OBJECTION, ECF No. 35, denied his downward variance motion, ECF No. 36, and imposed a sentence of

16

incarceration of one hundred (100) months—a sentence at the low end of Crawford's sentencing guidelines range that included in its calculation the four-point enhancement pursuant to U.S.S.G. § 2K2.1(b)(6)(B). ECF Nos. 61, 62, 63.

## II. CRAWFORD'S CONDUCT

For reasons that will become apparent later in the analysis, to properly address the issues, the Court must make an initial factual determination: Does Crawford's drug-related felonious conduct constitute simple drug possession or drug trafficking? For the reasons set forth below, the factual record teaches that Crawford was engaged in felonious drug trafficking rather than simple drug possession.

In addition to the charge of possession of a firearm by a convicted felon, Crawford was charged with possession of a controlled substance (to wit: methamphetamine) with the intent to distribute in violation of 2 U.S.C. § 841(a)(1), (b)(1)(C). ECF No. 19, at 2. "Possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1)[] is a drug trafficking crime." United States v. Shue, No. 94-5486, No. 94-5487, 1995 U.S. App. LEXIS 6399, at *2 (4th Cir. Mar. 30, 1995) (per curiam) (unpublished) (citing United States v. Fisher, 912 F.2d 728, 731 (4th Cir. 1990)). However, as part of the Plea Agreement, the United States agreed to dismiss the intent-to-distribute charge, ECF No. 21, at 4; and, the fact that Crawford

17

was indicted on the drug-trafficking charge affords no basis upon which to find that Crawford engaged in drug trafficking.

At a trial on the merits, the United States, of course, must prove beyond a reasonable doubt the elements of a crime such as drug trafficking, which include: "(1) possession of a narcotic controlled substance; (2) knowledge of the possession; and (3) the intent to distribute." United States v. Hicks, 64 F.4th 546, 552 (4th Cir. 2023) (quoting United States v. Collins, 412 F.3d 515, 519 (4th Cir. 2005) (internal quotation marks omitted)). At sentencing, the United States need only prove the application of the enhancement by a preponderance of the evidence. United States v. Kiulin, 360 F.3d 456, 460 (4th Cir. 2004).

To determine whether Crawford engaged in drug trafficking, rather than drug possession, the Court considers a constellation of factors, including: "(1) the quantity of the drugs; (2) the packaging; (3) where the drugs are hidden; and (4) the amount of cash seized with the drugs." Hicks, 64 F.4th at 552 (quoting Collins, 412 F.3d at 519). And, of course, it is appropriate to consider the presence of the firearm itself because "[g]uns are an integral part of the tool chest of those involved in the drug trade." United States v. Hager, 721 F.3d 167, 181 (4th Cir. 2013) (citing United States v. Mobley, 40 F.3d 688, 697 (4th Cir. 1994) ("This Court and other courts have long recognized that drug dealers use firearms to protect their narcotics and the large

18

amount of cash in their possession.")))). The Fourth Circuit has also explained that the following listed factors are pertinent to whether someone was engaged in drug trafficking:

> Our precedents leave no doubt that "intent to distribute may in proper circumstances be inferred from the amount of possession." United States v. Welebir, 498 F.2d 346, 350 (4th Cir. 1974) . . . Our decisions have acknowledged that the possession of a handgun along with a controlled substance is strong circumstantial evidence of intent to distribute, as is packaging of drugs in a manner that would facilitate their sale. See Fisher, 912 F.2d at 731. The possession of a large quantity of a controlled substance in an area known for its high level of drug trafficking is likewise evidence of intent to distribute. See Collins, 412 F.3d at 518. The fact that the group of people around [a police officer] dispersed when the police officers approached provides further support for the [drug trafficking] verdict.

United States v. Starling, 220 Fed. App'x 238, 242 (4th Cir. 2007) (per curiam) (unpublished) (emphasis added).

Based on these factors, the preponderance of the evidence supports a finding that Crawford engaged in felony drug trafficking rather than simple drug possession. Crawford unquestionably possessed a firearm during the commission of the drug offense. He described the possession of the firearm as necessary to "protect himself," and, by extension, his drug-related activity. ECF No. 54, at 75-76. It is not disputed that Crawford possessed the firearm while in a high crime, violent area that was known as an open-air drug market. ECF No. 22, at 1-2. Crawford had far more drugs on his person (18 methamphetamine pills) than a single dose, even for someone of his high tolerance (approximately two to three

of those pills), which augurs in support of a finding that he intended to distribute them. Credible opinion testimony demonstrates that, on June 13, Crawford was engaged in a hand-to-hand drug transaction. ECF No. 54, at 29-30, 38-39. And, Crawford fled the scene upon approach by police officers, throwing off his crossbody bag (containing the firearm) in the process. Id. at 65, 67-68. Taken together, the preponderance of the evidence establishes that Crawford was engaged in drug trafficking rather than just drug possession at the time that he possessed the firearm on June 13.

### III. STANDARD OF REVIEW

Although this matter is before the Court on the Defendant's OBJECTION, the United States has the burden to prove, by a preponderance of the evidence, that the enhancement, U.S.S.G. § 2K2.1(b)(6)(B), should apply to Crawford. United States v. Reyna, 336 Fed. App'x 353, 354 (4th Cir. 2009) (per curiam) (unpublished) (citing Kiulin, 360 F.3d at 460). And, when making findings of fact "to appropriately calculate the advisory guideline range," the Court must find that the United States has proven those facts "by a preponderance of the evidence." United States v. Harvey, 532 F.3d 326, 337 (4th Cir. 2008) (citing United States v. Battle, 499 F.3d 315, 322-23 (4th Cir. 2007)).

## IV. DISCUSSION

The dispute today arises over whether the four-point sentencing guidelines enhancement, U.S.S.G. § 2K2.1(b)(6)(B), should be included in the calculation of the Defendant's Offense Level in the PSR that forms the basis of his recommended sentencing range pursuant to the Guidelines. That enhancement reads as follows:

> If the defendant—used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense . . . increase [the Total Offense Level] by four levels.

U.S.S.G. § 2K2.1(b)(6)(B) (emphasis added). Specifically, the parties disagree over the meaning of the phrase "in connection with." The meaning of that phrase has been heavily disputed over the last almost thirty-five years since the enhancement's enactment in 1991. For today's case, it is necessary to assess anew the phrase's meaning because of recent decisions made by the Supreme Court of the United States, Kisor, 588 U.S. 558, and the United States Court of Appeals for the Fourth Circuit, Boler, 115 F.4th 316.

For decades, challenges, or "objections," to the application of a sentencing guideline based on the Commission's Commentary interpreting that guideline were adjudicated pursuant to the standard established by the Supreme Court in United States v.

21

Stinson, 508 U.S. 36, 113 S. Ct. 1913, 123 L. Ed. 2d 598 (1993).

Stinson held that the Commission's Commentary, which interprets the meaning of a Guideline or enhancement itself, is "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Id. at 38. So, when considering such challenges, courts would typically defer to the Commentary's interpretation of a guideline.

In 2019, the Supreme Court held that agencies' interpretations of their own regulations were to be assessed under a similar deference standard as that established by Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), which provided the standard for reviewing agencies' regulations that interpreted congressionally enacted statutes. Specifically, in Kisor v. Wilkie, the Supreme Court held that, before deferring to agencies' interpretation of their own regulations, courts must first assess the language of the regulation itself to determine if that language was "genuinely ambiguous." Kisor, 588 U.S. at 573, 575. If a court determined that the regulation's text was genuinely ambiguous, then it could examine the agency's interpretations of that regulation for further guidance. However, only those agency interpretations that are "reasonable" were of the sort that could potentially receive judicial deference, and, even if reasonable, a court need not defer

to those interpretations unless certain additional preconditions were met. Id. at 575-79. In the wake of Kisor, the circuit courts split over whether to continue to apply the Stinson standard when reviewing challenges to the Guidelines' Commentary or to adopt the more general Kisor standard of review even for the Guidelines. E.g., compare United States v. Pratt, No. 20-10328, 2021 U.S. App. LEXIS 37022, at *6-7 (9th Cir. Dec. 15, 2021) (mem.) (unpublished) (noting that the United States Court of Appeals for the Ninth Circuit would continue to apply the Stinson standard of review for the Guidelines rather than Kisor's standard), with Boler, 115 F.4th at 322 (holding that the Fourth Circuit would thenceforth apply Kisor's approach to reviewing challenges to the Guidelines).

In 2024, the Supreme Court overruled Chevron and the deference standard that it required when courts needed to assess agencies' regulatory interpretations of congressionally enacted statutes, which was the standard that undergirded Kisor deference. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 144 S. Ct. 2244, 2273, 219 L. Ed. 2d 832 (2024). Also, in 2024, the Fourth Circuit found that Kisor abrogated Stinson and adopted Kisor's approach in the Guidelines context. Boler, 115 F.4th at 322 n.4. Therefore, when considering whether U.S.S.G. § 2K2.1(b)(6)(B) should apply to Crawford, the Court must do so pursuant to the standards set forth in Kisor and Boler.

At the first step of the <u>Kisor</u> and <u>Boler</u> analysis, the Court must use "all the standard tools of interpretation" to examine the text of the enhancement to determine whether it is "genuinely ambiguous." <u>Kisor</u>, 588 U.S. at 573, 575; <u>Boler</u>, 115 F.4th at 322-23. This inquiry requires that the Court "carefully consider the text, structure, history, and purpose" of the enhancement "in all the ways it would if it had no agency to fall back on." <u>Kisor</u>, 588 U.S. at 575; <u>Boler</u>, 115 F.4th at 335.

If the Court determines that the enhancement's language is <u>not</u> genuinely ambiguous, then it must "state that unambiguous meaning and apply the enhancement accordingly." In doing so, the Court may not consider the Commission's Commentary that interprets the enhancement "in its review or application." <u>United States v. Roberts</u>, No. 3:24-cr-137, ___ F. Supp. 3d ___, 2025 U.S. Dist. LEXIS 114613, at *18-19 (E.D. Va. June 16, 2025).

The analysis only continues to <u>Kisor</u> and <u>Boler</u>'s second step if the enhancement's language is genuinely ambiguous. At this second step, the Court must determine if the Commission's Commentary that interprets the enhancement's language is within the "zone of ambiguity" so that it resides "within the bounds of reasonable interpretation." <u>Kisor</u>, 588 U.S. at 575-76 (quoting <u>Arlington v. FCC</u>, 569 U.S. 290, 296, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013) (internal quotation marks omitted)); <u>Boler</u>, 115 F.4th at 323. If the Commentary's interpretation is unreasonable, the

24

Court cannot defer to it and must, instead, determine if the conduct at issue can legitimately fall within the conduct captured by the enhancement's genuinely ambiguous language. See Roberts, 2025 U.S. Dist. LEXIS 114613, at \*19. However, even if the Court determines that the Commentary is a reasonable interpretation of the enhancement, deference is not necessarily warranted. Kisor, 588 U.S. at 576-77; Boler, 115 F.4th at 323. A third step remains for consideration.

Kisor and Boler's third step permits a court to defer to a reasonable interpretation of the Commentary if "Congress would have wanted" that interpretation based on an "independent inquiry into whether the character and context of the [Commission's] interpretation entitles it to controlling weight." Kisor, 588 U.S. at 576; Boler, 115 F.4th at 323. In this inquiry, the Court must consider a set of (nonexhaustive) factors, including whether: (1) the interpretation is the "official position" of the Commission; (2) the interpretation implicates the Commission's "substantive expertise"; and (3) the interpretation "reflects the fair and considered judgment" of the Commission. Kisor, 588 U.S. at 577-79; Boler, 115 F.4th at 328.

Although whether the phrase "in connection with" is genuinely ambiguous has not been decided (under the Kisor/Boler framework) by the Fourth Circuit, two United States Courts of Appeals have decided the issue under that framework. United States v. Perez, 5

F.4th 390 (3d Cir. 2021); United States v. James, 135 F.4th 1329 (11th Cir. 2025). Those courts reached differing conclusions, resulting in a circuit split on the issue.

In Perez, a fractured panel of the Third Circuit held that the phrase "in connection with" was genuinely ambiguous, that Comment 14(B) interpreting that language was reasonable, and then deferred to the Commission's interpretive Commentary, which resulted in applying the enhancement to the defendant. Perez, 5 F.4th at 394-402. Conversely, in James, the Eleventh Circuit held that the phrase "in connection with" was not genuinely ambiguous, which led it not to consider the Commentary, and, instead, to apply the enhancement to the defendant based on its unambiguous language. James, 135 F.4th at 1333-36. The Court views the decision in James as more persuasive and reaches a similar conclusion today, albeit for somewhat different reasons.

Crawford's objection originally took the form of a factual challenge: that Crawford's possession of the firearm in the crossbody bag had no "connection" to the related felony drug offense, and, therefore, that the enhancement should not apply. In doing so, he argued that the Commission's standard for that phrase set out in Comment 14(A), which interprets "in connection with" to mean that the firearm "facilitated or had the potential of facilitating" a defendant's felonious drug possession offense, U.S.S.G. § 2K2.1 Comment., n.14(A), controlled rather than Comment

26

14(B), which interprets "in connection with" to mean that the firearm must be "in close proximity" to the drugs in the defendant's possession when he is in the commission of a felonious drug trafficking offense. Id. § 2K2.1 Comment., n.14(B). Then, on the view that Comment 14(A) (rather than Comment 14(B)) applies, Crawford argued that he was engaged in simple drug possession rather than drug trafficking and that the firearm at issue today did not "facilitate[] or ha[ve] the potential of facilitating" his drug possession. ECF No. 35, at 2-6. Therefore, he concluded, the enhancement cannot apply to him when calculating an appropriate sentence. Id. at 6.

The United States disagreed. It argued, pursuant to Kisor and Boler, that the language of the enhancement is not genuinely ambiguous and that, based on its unambiguous meaning, it must necessarily apply to Crawford's conduct. Based on that view, the United States argued that the Court need not, and, indeed, cannot, consider the Commentary—neither Comment 14(A) nor Comment 14(B)— to the enhancement. Without regard to the type of related felony drug offense at issue, the United States argued, the enhancement should apply if the firearm was connected to that felonious drug offense. To that end, the United States argued that the Court should adopt the same position on the enhancement's text as in James: That "in connection with" unambiguously means that the "firearm possession is contextually, causally, or logically

27

.

related to that offense." ECF No. 41, at 2-8 (quoting James, 135 F.4th at 1334). And, in the view of the United States, Crawford's conduct meets that standard and therefore the enhancement should apply to him.

In replying to the United States, Crawford's objection for the first time took on the form of a Kisor/Boler objection to the enhancement. But, he ultimately reached the same conclusion as in his opening brief. So, again, Crawford argued that: (1) the enhancement's text is genuinely ambiguous; (2) his conduct constituted drug possession rather than trafficking, which would implicate Comment 14(A); (3) Comment 14(A) is a reasonable interpretation of the enhancement to which the Court should defer; and (4) his firearm possession did not "facilitate[] or ha[ve] the potential of facilitating" his drug possession, rendering the enhancement inapplicable. ECF No. 43, at 1-5. In the alternative, Crawford contended that, even if the Court agrees with the United States and concludes that the enhancement's text is not genuinely ambiguous, Crawford's conduct, as a factual matter, does not rise to the level of "facilitation" proposed by the United States, rendering the enhancement still inapplicable. Id. at 5.[16]

After the parties set out their initial positions, the Court ORDERED supplemental briefing. ECF Nos. 55, 56, 57.

---

[16] Previously, Crawford's positions were somewhat contradictory. Supra, at 2 n.1.

28

### V. ANALYSIS

The dispositive legal issue is whether the phrase "in connection with" in the text of the enhancement, U.S.S.G. § 2K2.1(b)(6)(B), is genuinely ambiguous. Kisor, 588 U.S. at 573; Boler, 115 F.4th at 322-23. After considering the text, structure, history, and purpose of the enhancement, for the reasons that follow, the Court holds that the phrase "in connection with" is not genuinely ambiguous. Consequently, the Court need not consider whether the Commentary interpreting that enhancement is reasonable and deserving of judicial deference.

Ordinarily, it is preferable to articulate a single basis for decision, and conversely, to refrain from making alternative holdings. Karsten v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc., 36 F.3d 8, 11-12 (4th Cir. 1994). However, because two Courts of Appeals have reached differing conclusions after conducting a Kisor and Boler analysis for this enhancement, the question has not been decided in our Circuit, and Crawford raises arguments in the alternative, the Court finds it appropriate to make an alternative holding based on a full Kisor and Boler analysis, which assess the reasonableness of the Commentary assuming that the enhancement itself is genuinely ambiguous. Because the Court has found that Crawford engaged in drug trafficking, rather than simply possessed the drugs in question, Comment 14(B) is implicated in that analysis rather than Comment

29

14(A). U.S.S.G. § 2K2.1 Comment., n.14(A)-(B). For its alternative holding, the Court concludes that Comment 14(B) is an unreasonable interpretation of the enhancement that is not owed judicial deference. Nonetheless, even in that scenario, the Court finds that Crawford's conduct is encompassed within even an ambiguous reading of the enhancement. Therefore, whether the enhancement is genuinely ambiguous or not, it applies to Crawford. The reasoning for the primary and alternative holdings are set out below.

### A. THE PHRASE "IN CONNECTION WITH" IN THE TEXT OF U.S.S.G. § 2K2.1(b)(6)(B) IS NOT GENUINELY AMBIGUOUS.

When undertaking Kisor and Boler's first step, it is necessary to assess whether the phrase "in connection with" is genuinely ambiguous. In doing so, the Court must consider the "text, history, structure, and purpose," of the enhancement "in all the ways it would if it had no agency to fall back on." That necessitates the use of "all the standard tools of interpretation" to determine whether the enhancement's text is genuinely ambiguous or not. Kisor, 588 U.S. at 573, 575; Boler, 115 F.4th at 335.

The analysis begins with the text of the enhancement, which reads as follows:

> If the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense . . . increase [the Total Offense Level] by four levels.

U.S.S.G. § 2K2.1(b)(6)(B) (emphasis added). The text of the enhancement does not specifically define the phrase "in connection with."[17] Absent a definition in the appropriate Guideline or enhancement, courts must "construe terms in the Sentencing Guidelines according to their ordinary meaning." United States v. Haas, 986 F.3d 467, 480 (4th Cir. 2021). In doing so, the Court routinely turns to dictionaries for assistance. Boler, 115 F.4th at 323; Nat'l Coal. for Students with Disabilities Educ. and Legal Def. Fund v. Allen, 152 F.3d 283, 288-89 (4th Cir. 1998). Of equal importance, "the words must be read in their context and with a view to their place in the overall regulatory scheme." Boler, 115 F.4th at 325 (quoting Lynch v. Jackson, 853 F.3d 116, 121 (4th Cir. 2017)) (alterations and quotation marks omitted). So, in "interpreting a regulation's plain language, [courts] look to 'the specific context in which the language is used, and the broader context of the' regulation as a whole." Id. (quoting Hurlburt v. Black, 925 F.3d 154, 158 (4th Cir. 2019) (en banc)).

### 1. Contextual and Historical Analysis

Most often, statutory interpretation begins with a look at the dictionaries to ascertain the ordinary meaning of undefined text. But, in this instance, it is most helpful to begin the

---

[17] Of course, only the Commentary does so. But, at this step, our inquiry must remain focused solely on the text of the enhancement.

analysis by understanding the extensive and substantively-rich context in which the disputed language came to be.

In this Circuit, the context includes pre-Kisor/Boler application of the enhancement that also involves interpretation of the phrase "in connection with." Thus, in 2020, the Fourth Circuit held that the phrase "in connection with" means, at least in the context of when Comment 14(A) applies (i.e., for felonious drug possession offenses), that the firearm "facilitated, or had the potential of facilitating" the other felony offense. United States v. Bolden, 964 F.3d 283, 288 (4th Cir. 2020). Today, however, the Fourth Circuit's decision in Bolden is not beyond question because that decision came after the Supreme Court decided Kisor, but before the Fourth Circuit decided Boler and adopted Kisor's approach to reviewing the Guidelines.

In Bolden, the Fourth Circuit started its analysis with the Commentary that interprets the present enhancement, and with earlier Fourth Circuit precedent that had also interpreted the enhancement through the lens of its Commentary, to determine what the text of the enhancement itself means. Id. at 287-88 (citing Untied States v. Jenkins, 566 F.3d 160, 162-63 (4th Cir. 2009)). Of course, pursuant to Boler, the Fourth Circuit has since abandoned that approach. Boler, 115 F.4th at 322-23. Therefore, for today's case, it is necessary to examine anew the text of U.S.S.G. § 2K2.1(b)(6)(B)—without looking to Jenkins, Bolden, or

the Commentary—to determine whether the text is genuinely ambiguous, and, if not, what that text, standing alone, means.

However, although the Court cannot rely directly on Jenkins, Bolden, or other decisions interpreting the enhancement through the lens of the Commentary, it can take into account decisions interpreting the enhancement's text that predate the promulgation of the Commentary. Those decisions provide support for the conclusion that the phrase "in connection with" is not genuinely ambiguous. To properly examine and apply those decisions, however, it is necessary to make a brief foray into history.

That journey begins in 1990, when the Commission first considered enacting the enhancement, which was then proposed as U.S.S.G. § 2K2.1(b)(7). As originally proposed, the text of the enhancement read:

> If the defendant used, possessed, or transferred any firearm, or knew, intended, or had reasonable cause to believe the firearm would be used, possessed, or transferred, during or in relation to any violent or drug-related conduct, or any felony offense, increase [the Offense Level] by [2-4] levels.

Memorandum from Rich Murphy, Coordinator, Firearms and Explosive Materials Working Grp., to U.S. Sent'g Comm'rs, U.S. Sent'g Comm'n, and Phyllis Newton, Revised Firearms and Explosive Materials Working Group Report and Table of Contents 54 (Dec. 11, 1990) (on file with Nat'l Archives, Identification No. 318653439), https://catalog.archives.gov/id/318653439 [hereinafter Murphy

Memorandum] (emphasis added). The drafters of the enhancement found "[s]trong statutory support" for it and based its wording on the underlying statutory predicate for the § 2k Guideline: specifically, 18 U.S.C. § 924(b)-(c), (g). Id. at 54-55.

However, the originally proposed text did not find its way into the published Guidelines. Instead, the 1991 Guidelines (which was the first version of the Guidelines to contain the enhancement) used the phrase "in connection with" rather than the phrase "in relation to" to refer to the related felonious conduct. U.S.S.G. § 2K2.1(b)(5) (1991).[18] The enhancement's text has not substantively changed since its initial enactment in 1991 to today.[19]

---

[18] This change was but one alteration in a much larger package of changes and reformulations of the § 2K2.1 Guideline made by the Commission in 1991. As part of that more wide-ranging overhaul, the Commission requested the submission of comments from the public before promulgating the Guidelines changes. In that Public Comment Notice, the Commission explained that these alterations were made so that the § 2K2.1 guideline provisions would "rely[] more heavily on specific offense characteristics and less on the statute of conviction." United States Sentencing Commission: Sentencing Guidelines for United States Courts; Notice, 56 Fed. Reg. 1846, 1870 (noticed Jan. 17, 1991) [hereinafter Pub. Cmt. Notice]. However, it is unclear if that rationale applies with any specific import to the change from using the phrase "in relation to" to "in connection with."

[19] The only change during this time was in 2006 when the Commission renumbered the enhancement to § 2K2.1(b)(6)(B). Amendment 691, U.S. Sent'g Comm'n, https://www.ussc.gov/guidelines/amendment/691 (last visited July 11, 2025).

Two years after the enhancement was promulgated, the Supreme Court addressed the meaning of the phrase "in relation to" as used in the enhancement's statutory predicate, which punishes a person who uses a firearm "during and in relation to any crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1) (emphasis added). In Smith v. United States, the Supreme Court noted that the phrase is "expansive," but nonetheless had "boundaries." Smith v. United States, 508 U.S. 223, 237, 113 S. Ct. 2050, 124 L. Ed. 2d 138 (1993). Relying on dictionaries to help find the ordinary meaning of the phrase, the Supreme Court held that "'in relation to' means 'with reference to' or 'as regards.'" Id. (quoting Websters New International Dictionary 2102 (2d ed. 1950)). Therefore, it reasoned that, "at a minimum," the phrase must mean that "the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." Id. at 238. From there, the Supreme Court established the prevailing standard used when assessing whether someone has violated 18 U.S.C. § 924(c)(1): The firearm "at least must 'facilitate or have the potential of facilitating,'" the drug trafficking offense." Id. (quoting United States v. Stewart, 779 F.2d 538, 539 (9th Cir. 1985)).

While Smith provided clarity in the statutory context, it left in its wake uncertainty over the meaning of the slightly different phrase "in connection with" as used in the enhancement.

35

A (rather lopsided) split among several United States Courts of Appeals followed. On one side resided the First, Second, Seventh, Ninth, and Tenth Circuits as well as, most importantly for our purposes, the Fourth Circuit, all of which had held that the phrase "in connection with" as used in § 2K2.1(b)(6)(B) was analogous in meaning to the phrase "in relation to" established by the Supreme Court in Smith. United States v. Nale, 101 F.3d 1000, 1003-04 (4th Cir. 1996); United States v. Thompson, 32 F.3d 1, 7 (1st Cir. 1994); United States v. Sturgeon, 117 F.3d 641, 644 (2d Cir. 1997) (per curiam); United States v. Wyatt, 102 F.3d 241, 247 (7th Cir. 1996); United States v. Routon, 25 F.3d 815, 819 (9th Cir. 1994); United States v. Gomez-Arrellano, 5 F.3d 464, 466-67 (10th Cir. 1993). On the other side resided the Fifth Circuit, which held that "in connection with" did not have a synonymous meaning to "in relation to" as interpreted by the Supreme Court. United States v. Condren, 18 F.3d 1190, 1199-1200 (5th Cir. 1994).[20] The Fourth Circuit later reaffirmed its decision in Nale and explicitly rejected the Fifth Circuit's alternate interpretation. United States v. Blount, 337 F.3d 404, 410-11 (4th Cir. 2003) (citing Condren, 18 F.3d at 1199-1200; United States v. Armstead, 114 F.3d

---

[20] The Eleventh Circuit relied on Condren and joined in the Fifth Circuit's interpretation of the phrase "in connection with," but did so when interpreting a different enhancement in the Guidelines. United States v. Young, 115 F.3d 834, 838 (11th Cir. 1997) (per curiam) (holding so in the specific context of U.S.S.G. § 4B1.4(b)(3)(A)).

504, 512 (5th Cir. 1997)). Therefore, by 2003, for the enhancement to apply in the Fourth Circuit: "The firearm must have some purpose or effect with respect to the . . . crime; its presence or involvement cannot be the result of accident or coincidence." Id. (quoting Smith, 508 U.S. at 238).

Such was the state of affairs when, in 2006, the Commission amended the Guidelines to include new Commentary interpreting U.S.S.G. § 2K2.1(b)(6)(B).[21] The Commission advised that Comment 14(A) and 14(B) were added to "address[] a circuit conflict pertaining to the application of [§ 2K2.1(b)(6)(B)], specifically with respect to the use of a firearm 'in connection with' burglary and drug offenses." Amendment 691, supra. That amendment to the Commentary adopted the "language from Smith v. United States, 508 U.S. 233 (1993) [to] provide[] at Application Note 14 that [§ 2K2.1(b)(6)(B)] appl[ies] if the firearm facilitated, or had the potential of facilitating, another felony offense or another offense, respectively." Id. (emphasis added). Although the Commission amended the Commentary to the enhancement, it did not simultaneously amend the enhancement's text, which retained the phrase "in connection with" rather than "in relation to." Compare U.S.S.G. § 2K2.1(b)(5) (1991), with U.S.S.G. § 2K2.1(b)(6)(B) (2006).

---

[21] This was the same amendment that renumbered the enhancement from § 2K2.1(b)(5) to § 2K2.1(b)(6)(B). Amendment 691, supra.

The circuit split from over 20 years ago demonstrates that there were genuine, well-thought, and well-reasoned disagreements over what the phrase "in connection with" meant in the context of the enhancement. That such disagreement could exist provides contextual and historical support for the proposition that the text of the enhancement, specifically the phrase "in connection with," is, in fact, genuinely ambiguous.

However, it is necessary to look beyond the existence of that circuit split and its purported resolution in the Commentary and also to consider the important "context" of the era when assessing the enhancement under modern doctrine. The "specific context in which the language is used, and . . . broader context" in which the enhancement inhabits, Boler, 115 F.4th at 325 (internal citation and quotation marks omitted), provides a strong counterweight to finding that the phrase "in connection with" is genuinely ambiguous.

Importantly for our case, the context within which this history resides teaches that the Fourth Circuit has held, repeatedly and unwaveringly, that the Supreme Court's definition of "in relation to" is identical to the meaning of the phrase "in connection with" as used in U.S.S.G. § 2K2.1(b)(6)(B). That decision was first reached in 1994, Nale, 101 F.3d at 1003-04, and reaffirmed again in 2001, United States v. Garnett, 243 F.3d 824, 828-29 (4th Cir. 2001); United States v. Kaiser, 1 Fed. App'x 219,

221 (4th Cir. 2001) (per curiam) (unpublished), 2002, United States v. Gosnell, 39 Fed. App'x 847, 849 (4th Cir. 2002) (per curiam) (unpublished); United States v. Batey, 43 Fed. App'x 582, 582 (4th Cir. 2002) (per curiam) (unpublished), and 2003. Blount, 337 F.3d at 410-11. These decisions are distinct in an important respect from the Fourth Circuit's later decisions in 2009, Jenkins, 566 F.3d 160, and in 2020, Bolden, 964 F.3d 283. The earlier decisions all held that "in connection with" meant that the firearm had to facilitate or have the potential of facilitating the related felonious drug offense before the Commentary was ever published. And, Jenkins and Bolden relied on (1) the earlier decisions, and (2) the Commentary promulgated in 2006 to reach that same conclusion as to the meaning of "in connection with." Jenkins, 566 F.3d at 162-63; Bolden, 964 F.3d at 287-88. Therefore, while the analysis here cannot fully rely on the reasoning underlying the decisions of Jenkins and Bolden because of their abrogation by Boler, the analysis can take into account the earlier decisions of the Fourth Circuit in Nale, Garnett, Kaiser, Gosnell, Batey, and Blount in interpreting the phrase "in connection with" as identical to the phrase "in relation to." So, notwithstanding the contextual inference that can be drawn from the circuit split itself, those earlier Fourth Circuit decisions provide stronger textual and contextual support for the conclusion that the phrase "in connection with" is not genuinely ambiguous and means that a

firearm must have "facilitated or had the potential of facilitating" the related felony (drug) offense.

In the era before the Commission amended the Commentary to U.S.S.G. § 2K2.1(b)(6)(B) in 2006, the Fourth Circuit also interpreted other instances in which the Guidelines used the phrase "in connection with" identically to the Supreme Court's interpretation of the phrase "in relation to." E.g., Garnett, 243 F.3d at 828 n.6 (analogizing the meaning of "in connection with" in § 2K2.1(b)(6)(B) to U.S.S.G. § 2K2.1(c)(1)); United States v. Pearson, No. 98-4470, 1998 U.S. App. LEXIS 32636, at *3 (4th Cir. 1998) (per curiam) (unpublished) (same with respect to U.S.S.G. § 2B5.1(b)(3)). This consistent application of Smith by the Fourth Circuit across various provisions of the Guidelines that use the same phrase "in connection with" provides further textual and contextual support for the conclusion that the phrase has a single, unambiguous meaning as used in § 2K2.1(b)(6)(B).

Although the Commission's 2006 amendments to the enhancement took effect nationwide, the Fourth Circuit's unique experience in addressing this enhancement, and the decisional law that it created along the way, differentiates, at least in part, the Court's decision today from those reached in Perez and James. For example, in Perez, the Third Circuit was of the view that the history of the 2006 amendment supports the conclusion that the phrase "in connection with" is genuinely ambiguous. Perez, 5 F.4th at 396.

That conclusion was based on the fact that the circuit split itself provides evidence of textual ambiguity. Although that is not an irrelevant consideration, it is also true that Perez did not consider the unique history of the Fourth Circuit's decisions of the pre-2006 era.

Comparatively, in James, we see that the Eleventh Circuit disagreed with the conclusion in Perez and opined, instead, that the enhancement's history confirms that the enhancement is not genuinely ambiguous. James, 135 F.4th at 1335-36. Although the conclusion in James is the same as the Court reaches today, the reasoning in James is somewhat circular. Nor does James take into account the unique history of the Fourth Circuit's decisions during this time.

James makes the point that the Commission amended the Commentary to the Guidelines in 2006, in part, to resolve the ambiguity behind the enhancement's text—as evidenced by the circuit split. Id. at 1336. It then states, however, that concluding that this history supports a determination of genuine ambiguity ignores a "key piece of the history," namely, that the "commentary [that] the Sentencing Commission added in Note 14 tracks the language of Smith." Id. From that point, James notes, that:

> [A]ll Smith did was define the analogous term "in relation to" according to its plain meaning. If anything, the Guideline's history confirms that the

plain reading of the Guideline's text has been correct
all along.

<u>Id.</u> (internal citation omitted).

In its view, <u>James</u> considered that the phrase "in connection with" is <u>not</u> genuinely ambiguous because the Commission amended the Commentary in 2006 to interpret the phrase "in connection with" to parallel <u>Smith</u>'s interpretation of "in relation to." However, that analysis looks to the <u>Commentary</u> as having weight in the interpretation of the meaning of the text of the enhancement itself, and, in so doing, the analysis violates the strictures of <u>Kisor</u>, and, for this Court's purposes, <u>Boler</u> as well. In other words, the reasoning in <u>James</u> allows the Commentary to define the meaning of the enhancement's text itself, and that reasoning is both circular and contrary to <u>Kisor</u> and <u>Boler</u>.

The views of <u>Perez</u> and <u>James</u> on the ambiguity issue and the impact of the 2006 amendments, therefore, do not persuade the Court to follow the lead of either decision. Nevertheless, the contextual evidence, viewed as a whole, tends to support the view that the enhancement is not ambiguous.

## 2. Additional Contextual Considerations and Textual Analysis

Further evidence supports that view. For example, the use of the phrase "in relation to," rather than "in connection with," in other areas of the Guidelines teaches that the phrase "in connection with" as used in U.S.S.G. § 2K2.1(b)(6)(B) has an

unambiguous meaning. In addition to U.S.S.G. § 2K2.1(b)(6)(B), the Court has found twenty-seven (27) uses of the phrase "in connection with" as part of a guideline or enhancement in the modern Guidelines.[22] By comparison, the phrase "in relation to" is used only six times: twice as part of the title or header of a guideline, U.S.S.G. §§ 2E5.3, 2K2.4, and then four times in the Commentary or explanatory sections of the Guidelines.[23]

Ordinarily, when two statutory phrases differ in their text, they ought to be read in a manner that gives them distinct meaning, or, in other words, in a way that does not render one phrase surplusage. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (1st ed. 2012) (describing the surplusage canon of statutory interpretation). And, of course, the

---

[22] Those instances include: (1) U.S.S.G. § 1B1.3(a)(1)(B)(iii); (2) U.S.S.G. § 2A4.1(b)(7); (3) U.S.S.G. § 2B1.1(b)(9)(D); (4) U.S.S.G. § 2B1.1(b)(16)(B); (5) U.S.S.G. § 2B5.1(b)(4); (6) U.S.S.G. § 2B5.3(b)(5); (7) U.S.S.G. § 2B5.3(b)(6)(B); (8) U.S.S.G. § 2D1.1(b)(16)(D); (9) U.S.S.G. § 2H4.1(b)(4); (10) U.S.S.G. § 2K1.3(b)(3)(B); (11) U.S.S.G. § 2K1.3(c)(1)(B); (12) U.S.S.G. § 2K2.1(b)(8)(B); (13) U.S.S.G. § 2K2.1(c)(1); (14) U.S.S.G. § 2K2.5(c)(1); (15) U.S.S.G. § 2K2.6(b)(1); (16) U.S.S.G. § 2L1.1(b)(8)(A); (17) U.S.S.G. § 2R1.1(d)(3); (18) U.S.S.G. § 4B1.4(b)(3)(A); (19) U.S.S.G. § 4B1.4(c)(2); (20) U.S.S.G. § 4C1.1(a)(3); (21) U.S.S.G. § 4C1.1(a)(7); (22) U.S.S.G. § 5C1.2(a)(2); (23) U.S.S.G. § 5K2.16; (24) U.S.S.G. § 5K2.17; (25) U.S.S.G. § 6B1.2(a); (26) U.S.S.G. § 7B1.2(d); and (27) U.S.S.G. § 8C4.6.

[23] As we remain in step one of the Kisor/Boler analysis, it is only appropriate to examine the use of the phrase "in relation to" when not used in the Commentary or explanatory portions of the Guidelines.

43

titles and headings of a statute or regulation are "permissible [but not dispositive] indicators of meaning." Id. at 221 (describing the title-and-headings canon of statutory interpretation).

Thus, the fact that the two phrases "in connection with" and "in relation to" are, in fact, used distinctly at different locations in the Guidelines could suggest that they have distinct meanings, or, at least, that may make one question whether the phrase "in connection with" is genuinely ambiguous rather than a carbon copy in meaning of the phrase "in relation to." However, two reasons counsel against reaching that conclusion here.

First, while it is true that those two distinct phrases are used in the Guidelines, the Commission consistently used the phrase "in connection with," rather than "in relation to," in the substantive portions of the Guidelines, including in U.S.S.G. § 2K2.1(b)(6)(B). Where, as here, "in relation to" does not appear in the substantive text of any guideline or enhancement itself, there is no real risk of rendering one phrase surplusage if "in connection with" is understood to be analogous to the phrase "in relation to" as defined by Smith. Second, the titles-and-headings canon does not change this view. Only two titles to a guideline include the phrase "in relation to," and, as the United States points out, a cogent explanation for that use (rather than the use of "in connection with") is: The titles of the guidelines that use

44

"in relation to" track the statutory language used in their predicate statutes in a way that remains both descriptive and broad enough to capture all of what is proscribed in those statutes. ECF No. 55, at 6-7 (citing 18 U.S.C. §§ 924, 929, 1027). That understanding provides a distinct understanding of the phrase "in relation to" as used in the titles from the meaning of the phrase "in connection with" as used in the substantive portion of the text of the several guidelines and enhancements in which it appears.

### 3. Dictionaries and Additional Textual Analysis

The analysis of undefined statutory or regulatory text permits resort to dictionaries to ascertain the ordinary meaning of the undefined text. Boler, 115 F.4th at 323; Allen, 152 F.3d at 288-89. Here, dictionaries provide strong evidence for the conclusion that the phrase "in connection with" is not genuinely ambiguous as used in U.S.S.G. § 2K2.1(b)(6)(B) because the because they provide substantially similar definitions for the term "connection"—the operative word in the phrase "in connection with."

For example, the Oxford English Dictionary defines "connection" to mean the "condition of being related to something else by a bond of interdependence, causality, logical sequence, coherence, or the like; relation between things one of which is bound up with, or involved in, another." Connection, Oxford English

45

*Dictionary*, https://www.oed.com/dictionary/connection_n?tab=meani ng_and_use#8559377 (last accessed July 16, 2025) (emphasis added). The Merriam-Webester Dictionary defines "connection" to mean: "the act of connecting: the state of being connected: such as: (a) causal or logical relation or sequence[;] (b)(1) contextual relation or association." *Connection*, Merriam-Webester Dictionary, https://www.merriam-webster.com/dictionary/connection         (last accessed July 16, 2025) (emphasis added). Lastly, the American Heritage Dictionary defines the term "connection" to mean an "association or relationship[;] . . . [r]eference or relation to something else; context." *Connection*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=connectio n (last accessed July 16, 2025) (emphasis added).

These definitions have not changed much over the decades, or, indeed, since before 1991—the year in which the enhancement was enacted. See *James*, 135 F.4th at 1334 (collecting dictionaries from 1987-1989 to define the phrase "connection" as meaning "an 'association; relationship; . . . contextual relation,' or a 'causal or logical relation or sequence.'" (internal citations omitted)). And, they are substantially similar to the Supreme Court's holding that "'in relation to' means 'with reference to' or 'as regards.'" *Smith*, 508 at 237 (quoting Websters New International Dictionary, *supra*).

Following its review of these dictionary definitions, the Eleventh Circuit in James held that the phrase "in connection with" was not genuinely ambiguous and that "a person possesses a firearm 'in connection with' another offense if the firearm possession is contextually, causally, or logically related to that offense." Id. (quoting U.S.S.G. § 2K2.1(b)(6)(B)). That definition conformed with others in Eleventh Circuit caselaw, id. (collecting cases), and, unsurprisingly, parallels closely with Smith's definition of "in relation to."

The Court likewise considers these dictionary definitions to support the conclusion that the phrase "in connection with" has a singular unambiguous meaning—one that is identical to the meaning of the phrase "in relation to." For a firearm to "facilitate" a felonious drug offense in a manner that ensures it was not simply coincidentally or accidentally related to that offense, it must be true that the firearm assisted in (be related to) the causing of the drug offense; it must have some logical or contextual relation to, and thus be linked, to the crime. In this way, these dictionary definitions, like the Smith decision and the Fourth Circuit's pre-2006 decisions, all lead to the same conclusion: The phrase "in connection with" as used in U.S.S.G. § 2K2.1(b)(6)(B) is not genuinely ambiguous and means that the firearm must have "facilitated or had the potential of facilitating" the related felony drug offense.

In Perez, the Third Circuit reached a different conclusion. But, the Perez analysis is not persuasive. To begin, Perez did not examine any dictionary definitions of the term "connection." Instead, Perez relied on circuit precedent that had "previously observed, before Comment 14's addition to the Commentary in 2006, that the phrase 'in connection with' is notable for its vagueness and pliability.'" Perez, 5 F.4th at 396 (quoting United States v. Loney, 219 F.3d 281, 283 (3d Cir. 2000)). That pre-2006 standard stands in stark contrast to the Fourth Circuit's consistent and unwavering understanding of the phrase in that era. E.g., Blount, 337 F.3d at 410-11. After the brief precedent-driven analysis of the enhancement's text, Perez ultimately held that "the text of § 2K2.1(b)(6)(B) suggests, but does not establish, its ambiguity. What confirms the Guideline's ambiguity is the history of its text" (referring to the circuit split and enhancement's 2006 amendments). Id. However, as explained above, while that history does demonstrate a circuit split on the proper interpretation of "in connection with," it also demonstrates the lopsidedness of that split in favor of adopting Smith's approach. And, importantly for today's case, the Fourth Circuit has not deviated from its adoption of that approach.

One final point. In Kisor, the Supreme Court noted that one aspect that evinces a genuinely ambiguous regulation is that: "[The regulation] may not directly or clearly address every issue; when

48

applied to some fact patterns, [it] may prove susceptible to <u>more than one reasonable reading</u>." <u>Kisor</u>, 588 U.S. at 566 (emphasis added). And, one may argue that the fact that the Commission provided two different interpretations of the enhancement in the Commentary depending on the underlying factual scenario—drug possession (Comment 14(A)) or drug trafficking (Comment 14(B))—must necessarily mean that the text is genuinely ambiguous because it allows for different readings of the enhancement's text depending on the relevant fact pattern. However, as explained below, only one of those two interpretations is a "reasonable reading," <u>Kisor</u>, 588 U.S. at 566, of the enhancement. Unlike Comment 14(A), Comment 14(B) is a patently <u>unreasonable</u> interpretation of the phrase "in connection with," and, instead, the only unambiguous reading, and, indeed, the only reasonable reading, of the enhancement provides that it must apply equally across all fact patterns—regardless of whether the facts support a finding of felonious drug possession or drug trafficking.

### 4. Purposive Analysis

The remaining factor to consider in the <u>Kisor/Boler</u> analysis is the purpose of the enhancement. Unlike the other factors, however, the enhancement's purpose does not provide much insight into the meaning of the phrase "in connection with." The discussions of the original form of the enhancement in 1990 center around Congress' increase in the mandatory minimum sentence for

offenses involving firearms when used in conjunction with other felony offenses, such as distribution of drugs. Murphy Memorandum, supra, at 55. In later reasoning included as part of the Public Comment Notice for the 1991 Guidelines, the alterations of § 2K2.1 generally were justified in part by stating that the changes were made in an effort to have the Guideline "rely[] more heavily on specific offense characteristics and less on the statute of conviction." Pub. Cmt. Notice, at 1870. The Fifth Circuit describes the addition of this enhancement to the Guidelines in 1991 as one reflecting "the increased concern about firearms, crimes of violence, and drug offenses. Needless to say, the unlawful use or possession of firearms represents an ever increasing assault on public safety; it is a clear and present danger." Condren, 18 F.3d at 1198. However, these statements of purpose relate to the enhancement as a whole. They do not speak to the purpose behind the Commission's use of the specific phrase "in connection with." The general purpose behind the enhancement, therefore, does not aid in assessing whether the phrase "in connection with" is genuinely ambiguous.

* * *

After examining the "text, history, structure, and purpose" of U.S.S.G. § 2.2K1(b)(6)(B), the Court has determined that the phrase "in connection with" is not genuinely ambiguous. Kisor, 588 U.S. at 573, 575; Boler, 115 F.4th at 322-23. The unambiguous

meaning of "in connection with" is the same as that used by the Supreme Court in <u>Smith</u> to define the meaning of the analogous phrase "in relation to": The firearm must facilitate or have the potential to facilitate the related felony drug offense. Because the text does not differentiate between any specific "felony offense," the enhancement may apply to <u>any</u> related felony offense, including both felonious drug trafficking and possession offenses.

Having held that U.S.S.G. § 2K2.1(b)(6)(B) is not genuinely ambiguous, the Court need not examine the reasonableness of the Commentary. However, it is necessary to complete the full <u>Kisor</u> and <u>Boler</u> analysis because the issue as presented is not settled in the Fourth Circuit and because the circuit split on this issue increases the likelihood of appeal. <u>Karsten</u>, 36 F.3d at 11-12. So, the analysis now shifts to the reasonableness question, assuming, for that purpose alone, that the enhancement is genuinely ambiguous.

## B. COMMENT 14(B) INTERPRETING U.S.S.G. § 2K2.1(b)(6)(B) IS UNREASONABLE AND DOES NOT WARRANT JUDICIAL DEFERENCE.

In determining whether the Commentary interpreting the phrase "in connection with" is reasonable, the Court must assess whether the "commentary falls 'within the bounds of reasonable interpretation.'" <u>Boler</u>, 115 F.4th at 327 (quoting <u>Kisor</u>, 588 U.S. at 576; <u>United States v. You</u>, 74 F.4th 378, 398 (6th Cir. 2023)).

The Commentary examined for reasonableness reads as follows:

**Application of Subsections (b)(6)(B) and (c)(1).—**

(A) In General.—Subsection[] (b)(6)(B) . . . appl[ies] if the firearm or ammunition <u>facilitated, or had the potential of facilitating</u>, another felony offense or another offense, respectively . . . .

(B) **Application When Other Offense is [a] Drug Offense.—** Subsection[] (b)(6)(B) . . . appl[ies] . . . (ii) in the case of a drug trafficking offense in which a firearm is found <u>in close proximity to</u> drugs, drug-manufacturing materials, or drug paraphernalia. In these cases, application of subsection[] (b)(6)(B) . . . <u>[is]</u> <u>warranted because the presence of the firearm has the</u> <u>potential of facilitating another felony offense</u> or another offense, respectively.

Id. § 2K2.1(b)(6)(B) Comment., n.14(A)-(B) (emphasis added). The Commentary bifurcates the application of U.S.S.G. § 2K2.1(b)(6)(B) depending on the related drug offense—possession (Comment 14(A)) or trafficking (Comment 14(B)). Comment 14(B) is applicable here because the Court has held that Crawford was engaged in drug trafficking rather than drug possession. However, analyzing whether Comment 14(A) is reasonable provides valuable insight into determining whether Comment 14(B) is reasonable. Therefore, a brief analysis of Comment 14(A) is in order.

In 2006, the Commission added Comment 14(A) in substantially the same form as it takes today. Notably, the title for Comment 14 was different in 2006: Instead of it reading "Application of Subsections (b)(6)(B) and (c)(1)," it read "'In Connection With'" to demonstrate that the Commission was primarily amending the Commentary to address the circuit split over the meaning of the

phrase "in connection with" in the enhancement. <u>Amendment 691</u>, <u>supra</u>. Apart from the title change, the content of Comment 14(A) has not changed since 2006.

The core language of Comment 14(A) that interprets, and provides context for, the meaning of "in connection with" is that the enhancement applies where the firearm "facilitated, or had the potential of facilitating" the other felony offense. U.S.S.G. § 2K2.1(b)(6)(B) Comment., n.14(A). The Commission chose that language based on <u>Smith</u>'s interpretation of the substantially similar phrase "in relation to." <u>Smith</u>, 508 U.S. at 237-38. While the Commission changed the originally proposed language in the enhancement from "in relation to" to "in connection with" before it was enacted into the Guidelines, the fact that the enhancement is still predicated on Section 924(c) does demonstrate that the meaning of the phrases are, if not identical, then, at least, similar. Perhaps for that reason, the Commission looked to the Supreme Court's decision in <u>Smith</u> as a sound basis to craft Comment 14(A) in interpreting the enhancement.

In <u>Smith</u>, the Supreme Court held that, because the phrase "'in relation to' means 'with reference to' or 'as regards,'" the phrase, "thus, at a minimum, clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence . . . Instead, the gun at least must 'facilitate, or

53

have the potential of facilitating,' the drug trafficking offense." Smith, 508 U.S. at 237-38 (quoting Stewart, 779 F.2d at 540). In amending the Commentary in 2006, the Commission directly adopted this language, stating that the "Reason for [the] Amendment" was to address a:

> circuit conflict pertaining to the application of current §2K2.1(b)(5) (re-designated by this amendment as §2K2.1(b)(6) . . . specifically with respect to the use of a firearm "in connection with" burglary and drug offenses. The amendment, adopting the language from Smith v. United States, 508 U.S. 223 (1993), provides at Application Note 14 that the provisions apply if the firearm facilitated, or had the potential of facilitating, another felony offense or another offense, respectively . . . In addition, the provisions apply in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug manufacturing materials, or drug paraphernalia. The Commission determined that application of these provisions is warranted in these cases because of the potential that the presence of the firearm has for facilitating another felony offense or another offense.

Amendment 691, supra (emphasis added). Therefore, at least for Comment 14(A), the Commission adopted, verbatim, the language of the Supreme Court in interpreting the substantially similar phrase "in relation to."

While the phrase "in connection with" is different than the phrase "in relation to," the Commission justifiably looked to the Supreme Court for guidance on how to resolve a dispute among the circuit courts about how to address substantially similar language in one of its guidelines—language itself that operates because of the same statute at issue in Smith. The Fourth Circuit affirmed

this approach in its pre-Kisor, pre-Boler decisions. E.g.,
Jenkins, 566 F.3d at 162 n.2 ("This interpretation of 'in
connection with' is a direct quotation of the Supreme Court's
interpretation of the phrase 'in relation to' . . . Therefore,
when interpreting 'in connection with,' we continue to treat the
phrases as synonymous and to rely on our cases interpreting 'in
relation to.'" (internal citations omitted)). That interpretation
unquestionably falls "within the bounds of reasonable
interpretation." Kisor, 588 U.S. at 559; Boler, 115 F.4th at 327.
Therefore, the Commission's Commentary, specifically, Comment
14(A), that interprets the phrase "in connection with" of U.S.S.G.
§ 2K2.1(B)(6)(B), can be considered as a reasonable interpretation
of that enhancement.[24]

---

[24] That reasonable interpretation warrants judicial deference
because it meets all three deference factors enunciated by the
Supreme Court: (1) it is the Commission's "official position"; (2)
it implicates the Commission's "substantive expertise"; and (3) it
"reflects the fair and considered judgment" of the Commission.
Kisor, 588 U.S. at 577-79; Boler, 115 F.4th at 328.

First, the interpretation is the "official position" of the
Commission because the "Commission's Commentary to the Guidelines
is unquestionably the 'official position' of the agency." Roberts,
2025 U.S. Dist. LEXIS 114613, at *78 (citing Boler, 115 F.4th at
328). Therefore, the first factor is met.

Second, the interpretation implicates the "substantive expertise"
of the Commission in the area of proscribing punishments for
firearm-related offenses. The Commission has developed that
substantive expertise over decades of refining the Guidelines'
punishments for firearms. See U.S.S.G. § 2K2.1 Comment., hist. n.
(recording twenty-nine (29) amendments to the firearm guideline
since its enactment in 1987). It also publishes extensive reports

As to Comment 14(A), it is not necessary to address either Perez or James (the new circuit split) because Perez only assessed the reasonableness of Comment 14(B), not Comment 14(A). So, Perez is not instructive. Further, because, in James, the Eleventh Circuit held that the phrase "in connection with" was not genuinely ambiguous, it did not address the Commentary or consider the reasonableness of it. So, too, then, James does not contribute to the analysis of Comment 14(A).

With this context on Comment 14(A) in mind, the analysis now turns to Comment 14(B). Under current Fourth Circuit precedent

---

on these firearm offenses to inform the public and its rulemaking. E.g., United States Sentencing Commission, Primer on Firearms Offenses (2025), https://www.ussc.gov/sites/default/files/pdf/tra ining/primers/2025_Primer_Firearms.pdf. These considerations support the conclusion that the Commission possesses substantive expertise in the firearm field. See Roberts, 2025 U.S. Dist. LEXIS 114613, at *78 (holding that similar evidence supported a finding of substantive expertise in the child pornography field). Therefore, the second factor is also met.

Third, the interpretation "reflects the fair and considered judgment" of the Commission. In promulgating this Commentary, the Commission took pains to assess an intricate circuit split involving more than half of the United States Courts of Appeals as well as a decision of the Supreme Court. It made a reasonable decision to accord the language of the enhancement with the substantially similar language of a statute interpreted by the Supreme Court. That statute was also the predicate statute that formed the basis for the enhancement in the first place. The Commission clearly articulated this reasoning when it amended the Commentary. Amendment 691, supra. All of these facts demonstrate that the Commission acted fairly, considered all pertinent issues, and reached a reasonable conclusion on how to appropriately interpret the enhancement. Therefore, factor three is also met, suggesting that the Commission's interpretation of the enhancement in Comment 14(A) warrants judicial deference.

applying the enhancement, the standard to apply the enhancement pursuant to Comment 14(B) is less burdensome than the standard for Comment 14(A) because the "requisite facilitation" required to apply Comment 14(A) is "infer[red] . . . from [the] close proximity between a firearm and drugs" when the related offense is felonious drug trafficking.[25] Bolden, 964 F.3d at 287. Consequently, when the felony offense is drug trafficking, pursuant to Comment 14(B), a "firearm 'found in close physical proximity to drugs' presumptively 'has the potential of facilitating' the trafficking offense." Id. at 287-88 (emphasis added). So, because the Court has found that Crawford was engaged in drug trafficking, if U.S.S.G. § 2K2.1(b)(6)(B) is regarded as genuinely ambiguous, Comment 14(B) requires that the Court only find that the firearm and drugs were "in close proximity" to each other for the enhancement to apply. However, the finding that Comment 14(A) is a reasonable interpretation of the enhancement does not necessarily mean that Comment 14(B) is also a reasonable interpretation.

Comment 14(A) was a reasonable interpretation of the enhancement because it tracked, verbatim, the Supreme Court's interpretation of the substantially similar phrase "in relation

---

[25] This stands in contrast, of course, to Comment 14(A)'s higher standard whereby the firearm must facilitate or have the potential to facilitate the simple drug possession offense.

to" in <u>Smith</u>. The Supreme Court's interpretation was based on statutory language that acts as the operative authority of the enhancement. So, to say that "in relation to" means to facilitate, or to have the potential of facilitating, another felony offense provides a reasonable basis to find that the phrase "in connection with" means the same.

The problem with Comment 14(B), however, is that it provides an entirely different interpretation of the enhancement from Comment 14(A). A different interpretation <u>could be</u> <u>reasonable</u>, but this one is not.

Comment 14(B) effectively creates a <u>per se</u> rule: The enhancement <u>automatically</u> applies when a firearm and drugs were "in close proximity" to one another—regardless of whether the firearm facilitated, or even had the potential of facilitating, the felonious drug trafficking offense. <u>Perez</u>, 5 F.4th at 403, 406 (Bibas, J., concurring in the judgment); <u>see also Bolden</u>, 964 F.3d at 287-88 ("When the 'other felony offense is drug trafficking,' then under Application Note 14(B), a firearm 'found in close proximity to drugs' <u>presumptively</u> 'has the potential of facilitating' the trafficking offense." (original alterations and emphasis removed) (new emphasis added) (quoting U.S.S.G. § 2K2.1 Comment., n.14(B)); <u>United States v. Eaden</u>, 914 F.3d 1004, 1009 (5th Cir. 2019) ("Application Note 14(B) instructs courts to apply the enhancement '<u>automatically</u>' when a 'firearm is found in close

proximity to drugs' during a trafficking offense but when drug trafficking is not present, 'no presumption is made.' (quoting United States v. Jeffries, 597 F.3d 690, 692-93 (5th Cir. 2009) (emphasis added))). In this way, the underlying reasoning that supported the conclusion that Comment 14(A) was reasonable has disappeared when it comes to Comment 14(B).

Comment 14(B) does not require any "connection"—in terms of facilitation or the potential of facilitation—between the firearm and the related felonious drug trafficking offense. Under Comment 14(B), mere temporal or physical proximity is alone sufficient to trigger the enhancement when the related offense is drug trafficking. Perez, 5 F.4th at 403-05 (Bibas, J., concurring in the judgment). So, even though the Commission states that it added Comment 14(B) to "address[] a circuit conflict" on the meaning of "in connection with" by "adopting the language from" Smith as its interpretation, Amendment 691, supra, it did not adopt the language from Smith when it directed that the enhancement is triggered by a related felonious drug trafficking offense.[26]

---

[26] Indeed, this fact is demonstrated by the language that the Commission itself used to justify the amendment. After stating that it amended the Commentary to accord with Smith's facilitation standard, it then went on (after briefly discussing a separate burglary standard) to state that the "in close proximity" standard in Comment 14(B) was added "[i]n addition" to Comment 14(A)'s facilitation standard—not as a part of that standard—to address the separate factual scenario of felony drug trafficking. Amendment 691, supra (emphasis added). Those standards were clearly intended, then, to be distinct and unrelated to each other.

Moreover, Comment 14(B) not only loses the justifying support of _Smith_, but also it directly contradicts the Supreme Court's holding in _Smith_ because the Supreme Court interpreted "in relation to" to explicitly exclude triggering 18 U.S.C. § 924 if the firearm's "presence or involvement [was] the result of accident or coincidence." _Smith_, 508 U.S. at 240. Comment 14(B) provides a significantly different interpretation from Comment 14(A) to apply the enhancement in the unique circumstance where the firearm and drugs were simply "close in proximity" without regard to of the firearm's facilitation (or lack thereof) of the felonious drug trafficking offense. A firearm could be in close proximity by accident or coincidence. So, Comment 14(B) runs afoul of _Smith_'s fundamental premise.

The Third Circuit reached a different conclusion. _Perez_ held that Comment 14(B) is a reasonable interpretation of the enhancement based on a reading of Third Circuit precedent as well as the text and histories of the guidelines and commentary. _Perez_, 5 F.4th at 397-99.

Much of the reasoning of _Perez_ is not persuasive because its analysis conflates the language of Comments 14(A) and 14(B) to essentially read them identically as requiring the firearm to have facilitated, or to have had the potential of facilitating, the related felony offense. _Id._ at 398. And, apparently realizing the difficulty created by reading two differently worded comments

60

identically, the Perez majority resolves the issue it creates by writing into Comment 14(B)'s text a rebuttable presumption so that the enhancement does not simply automatically apply based solely on proximity. Id. at 399.

In an opinion concurring only in the judgment in Perez, Judge Bibas points out the logical difficulty in the majority's position, noting that the majority "admits" that reading Comment 14(B) to "substitute[] proximity for a connection to a drug crime" would be "unreasonable." Id. at 402 (Bibas, J., concurring in the judgment) (citing id. at 396 ("We agree that [Comment 14(B)] would be unreasonable if it applied . . . any time guns and drugs are in close physical proximity to each other even if there is no relationship between them." (majority opinion))). Judge Bibas then goes on to describe how, while Comment 14(A) is essentially a reasonable interpretation of the enhancement because it derived from Smith, Comment 14(B) cannot be reasonable because the "Commission cannot choose a meaning that has been ruled out." Id. at 404-05. And, the meaning necessarily required by Comment 14(B)'s "close proximity" rule interprets the enhancement in a way the Supreme Court foreclosed in Smith: that it can trigger (or, at least its statutory predicate can trigger) by the mere accident or coincidence of a firearm's presence during a felony drug trafficking offense. Therefore, according to Judge Bibas, Comment 14(B)'s interpretation falls outside the "zone of ambiguity" and

thus courts cannot defer to it under Kisor. Id. at 404 (quoting Kisor, 588 U.S. at 574-75). Judge Bibas was spot on.

The majority opinion in Perez also held that Comment 14(B) is reasonable, in part because of the last sentence in the Comment, which provides that the enhancement's application "is warranted because the presence of the firearm has the potential of facilitating another felony offense or another offense, respectively." Id. at 397-98 (majority opinion) (citing U.S.S.G. § 2K2.1 Comment., n.14(B) (emphasis added)). That sentence, however, merely explains "why" the comment exists. It does not explain "what the Note's rule requires." Id. at 405 (Bibas, J., concurring in the judgment) (emphasis in original). As Judge Bibas correctly explained:

> [T]he Note's last sentence is a rationale: the Commission crafted the per se rule "because" the gun could facilitate another crime. The Note treats that as true whenever a gun is near drugs. Under the Note, a sentencing judge need not also find that the gun's presence was deliberate or that the gun in fact could have facilitated drug trafficking. Whenever guns are found near drugs, it says, the enhancement applies "automatically."
>
> Yet the majority reads this rationale into the rule. The majority says that the last sentence "provides that the Note should apply in cases where 'the presence of the firearm has the potential of facilitating' a drug-trafficking offense." That phrase, it claims, "necessarily excludes cases in which the presence of firearms was merely accidental." But that rationale is not part of the rule. The structure of the Note makes that clear.

*Id.* (emphasis in original) (internal citations omitted). As Judge Bibas explained, the last sentence in Comment 14(B) does not suddenly turn "in close proximity to" into meaning the same as "facilitating, or hav[ing] the potential of facilitating" the related felony drug offense. Indeed, it cannot. Comment 14(B) <u>must</u> mean something different than Comment 14(A), otherwise, it would be mere surplusage.

More troublesome, *Perez* reads into Comment 14(B) a rebuttable presumption that the defendant must rebut to avoid application of the enhancement. That, according to the *Perez* majority, renders Comment 14(B) reasonable. However, that approach impermissibly shifts the burden of proof to demonstrate that the enhancement should apply from the United States to the defendant. <u>Id.</u> at 406 ("[I]t lets the Government prove mere proximity. Then, the burden shifts to the defendant to <u>disprove</u> a connection. That approach mistakenly relieves the Government of its burden of proof." (emphasis in original)). That approach, if adopted, would raise potential constitutional due process concerns under the law of the Fourth Circuit because the United States bears the <u>entirety</u> of the burden of proof to demonstrate that any guideline or enhancement applies to a defendant. <u>Kiulin</u>, 360 F.3d at 460. The Court declines the invitation to subscribe to this rebuttable presumption rationale because to do so is inconsistent with <u>Kiulin</u> and its settled progeny.

An examination of the majority opinion and concurrence in Perez shows that Comment 14(B) lacks the valid justifications for its interpretation of U.S.S.G. § 2K2.1(b)(6)(B) that Comment 14(A) possesses. Unlike Comment 14(A), which employs the "facilitation" language of the Supreme Court in its reasonable interpretation of the enhancement, Comment 14(B)'s interpretation of "in connection with" to apply whenever a firearm and drugs are "in close proximity" to each other has no statutory, judicial, or other basis. The Commission's statement that Comment 14(B)'s language was also enacted to address a circuit split over the meaning of the phrase "in connection with," and to align it with the language in Smith, therefore carries no weight. The only explanation for "why" the "in close proximity" language is used is "because the presence of the firearm has the potential of facilitating another felony offense." U.S.S.G. § 2K2.1 Comment., n.14(B). However, just as two strangers sitting next to each other on a plane for hours may have no "connection" with each other, the mere presence of a firearm in the same general location as drugs does not mean that the two are connected in a way that the enhancement envisions. See Perez, 5 F.4th at 403 (Bibas, J., concurring in the judgment). Indeed, such an interpretation was disavowed by the Supreme Court in Smith, meaning that Smith cannot be the justification for Comment 14(B)'s separate interpretation of the enhancement for the specific related felony offense of drug trafficking.

64

The Fourth Circuit has never directly held that Comment 14(B) triggers U.S.S.G. § 2K2.1(b)(6)(B) <u>automatically</u> if the firearm and drugs are in "close proximity" with each other without any other connective tissue. However, the Court of Appeals has suggested that possibility by stating that it <u>presumptively</u> applies in such a scenario. <u>Bolden</u>, 964 F.3d at 287-88 ("When the 'other felony offense is drug trafficking,' then under Application Note 14(B), a firearm 'found in close proximity to drugs' <u>presumptively</u> 'has the potential of facilitating' the trafficking offense." (original alterations and emphasis removed) (new emphasis added) (quoting U.S.S.G. § 2K2.1(b)(6)(B) Comment., n.14(B)). <u>Bolden</u> itself foreclosed the automatic application theory, at least in part, if the firearm was present only accidentally or coincidentally. However, that holding only applied to Comment 14(A), which applies a higher standard: "when a firearm has 'some purpose or effect with respect to the other offense.'" <u>Id.</u> at 287 (quoting <u>Jenkins</u>, 566 F.3d at 162). Arguably, the Fourth Circuit's use of the term "presumptively" in <u>Bolden</u> does suggest that it views the <u>per se</u> rule of Comment 14(B) as potentially reasonable. However, that is not a persuasive view because the Fourth Circuit has not decided whether Comment 14(B) is reasonable under the rigorous standard necessitated by <u>Kisor</u> and <u>Boler</u>. Under the analysis required by those cases, there lacks little support for a finding that Comment 14(B) is a reasonable interpretation of

the enhancement. Therefore, finding that Comment 14(B) is an unreasonable interpretation of U.S.S.G. § 2K2.1(b)(6)(B) does not run afoul of Fourth Circuit precedent.

Ultimately, the plain reading of Comment 14(B) creates, at best, a presumption that impermissibly shifts the burden of proof to the defendant to demonstrate that the enhancement does not apply, or, at worst, a brightline, per se rule that requires the enhancement's application whenever drugs and a firearm are "found in close proximity to" one another when the related felony offense is drug trafficking, which runs afoul of Smith. Therefore, Comment 14(B) is an unreasonable interpretation of the enhancement that is outside the "zone of ambiguity" and outside the bounds of "reasonable interpretation." Kisor, 588 U.S. at 573-75; Boler, 115 F.4th at 327. Because it is an unreasonable interpretation of the enhancement, the Court need not examine the factors for whether it should defer to that commentary because no deference is owed at Kisor and Boler's third step.

If we continue to assume that the enhancement is genuinely ambiguous, and, having held that Comment 14(B) is an unreasonable interpretation of that enhancement, it becomes necessary to decide when the enhancement should apply to drug trafficking scenarios (i.e., to put forth a reasonable interpretation for the enhancement's application in such a scenario). The Court holds that the same reasonable facilitation standard that applies to

felony drug possession offenses, as established in Comment 14(A) and as established in the Court's analysis at <u>Kisor</u> and <u>Boler</u>'s first step, <u>supra</u>, applies in the scenario of felonious drug trafficking offenses.

As explained above, Comment 14(A) is a reasonable interpretation of the enhancement because it tracks directly the language of <u>Smith</u>. <u>Smith</u>, of course, involved a drug trafficking offense: "The phrase 'in relation to' . . . at a minimum, clarifies that the firearm must have some purpose or effect with respect to the <u>drug trafficking crime</u>." <u>Smith</u>, 508 U.S. at 238 (emphasis added). Applying that same facilitation standard of Comment 14(A), which tracks directly the language of <u>Smith</u>, as was the Commission's stated intention, <u>Amendment 691</u>, <u>supra</u>, to <u>all</u> drug related offenses, including drug trafficking ones, provides a proper and reasonable interpretation of any purported ambiguity in the phrase "in connection with" such that it can justifiably apply in drug trafficking cases like the one today. Further, holding that such an interpretation is reasonable in all drug-related felony offenses does not render Comment 14(A) surplusage because the inoperative clause (Comment 14(B)) already lacks any substantive meaning. It therefore cannot render an operative

phrase that does have legal import void of any meaning. Scalia & Garner, supra, at 174-78.[27]

### C. THE FIREARM WAS USED IN CONNECTION WITH CRAWFORD'S DRUG TRAFFICKING OFFENSE.

It is now necessary to determine if the enhancement applies to Crawford. As previously found, Crawford engaged in drug trafficking and did so while in possession of a firearm. Supra. So, the only remaining question is whether he possessed the firearm "in connection with" that related felony offense. In other words, pursuant to the unambiguous meaning of the enhancement, task is to decide whether the firearm "facilitated, or had the potential of facilitating" Crawford's drug trafficking offense.

This facilitation standard requires that the "firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." Smith, 508 U.S. at 238. In the Fourth Circuit, "this standard is not especially burdensome." Bolden, 964 F.3d at 287. The standard applies to cases "where a firearm is 'present for protection or to embolden the actor.'" Id. (quoting Jenkins, 566 F.3d at 162 (citation omitted)). Indeed, it is widely understood that the firearm "can embolden the actor to possess the

---

[27] It goes without saying that, having determined itself (rather than the Commission) what a reasonable interpretation of the enhancement is in the drug trafficking context, the Court need not conduct an analysis under Kisor and Boler's third step for whether that judicial interpretation is due deference.

drugs or provide the actor protection for himself and his drugs, which are likely to be personally valuable, even in small amounts." Jenkins, 566 F.3d at 162. The likelihood of the firearm's use for this purpose is increased depending on certain environmental factors such as whether the drug activity took place in public, the violent nature of the area in which the activity occurred, and the time of day that the firearm was possessed. See id. at 164.

In addition to the protection and emboldening rationale, many other "factors can [also] lead a fact finder to conclude that" the firearm facilitated, or had the potential to facilitate, the drug trafficking. United States v. Davis, 592 Fed. App'x 143, 144 (4th Cir. 2014) (per curiam) (unpublished) (quoting United States v. Lomax, 293 F.3d 701, 705 (4th Cir. 2002). Those factors include the "type of drug activity . . . being conducted, accessibility of the firearm, the type of weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." Id. (quoting Lomax, 293 F.3d at 705 (internal quotation marks omitted)).

Taken together, these factors demonstrate that the firearm unquestionably facilitated, or had the potential of facilitating, Crawford's drug trafficking. Crawford stated explicitly that he possessed the firearm to "protect himself." ECF No. 54, at 75-76. He possessed it in a public area known (1) as an open-air drug

69

market and (2) for its proclivity for violent activity that is linked to drug trafficking. ECF No. 22, at 1-2. The protection of self in such an environment facilitates drug trafficking. While in this environment, Crawford had eighteen methamphetamine pills on his person—far more than he could have ingested as a single dose (even with his high tolerance for the drug)—and was seen engaging in what was likely a hand-to-hand drug transaction with another individual. ECF No. 54, at 29-30, 38-39. Furthermore, upon inspection, the police discovered that the firearm was loaded. ECF No. 22, at 2. And, Crawford had acknowledged that, at the time of his arrest, he was a convicted felon who illegally possessed the firearm. Id.

Based on the amount of drugs possessed, the environmental elements surrounding that possession, the fact that the firearm was loaded and ready for immediate use, and Crawford's illegal possession of that firearm, it is reasonable to conclude that Crawford had the firearm not only to protect himself but also to protect the drugs on his person while engaging in the sale of those drugs. Therefore, the Court finds that the firearm in Crawford's possession was possessed with the purpose of facilitating his drug trafficking, and, that it did, in fact, facilitate, or have the potential to facilitate, that drug trafficking. The firearm was not possessed by coincidence of accident. The four-point enhancement, U.S.S.G. § 2K2.1(b)(6)(B), applies to Crawford.

## VI. CONCLUSION

For the foregoing reasons, the Court OVERRULED Crawford's OBJECTION, ECF No. 35, and APPLIED the four-point enhancement, U.S.S.G. § 2K2.1(b)(6)(B), to his Offense Level.

It is so ORDERED.

/s/ REP
_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July 28, 2025